# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

MARSHALL E. STALKER,
Individually and on behalf of all
Others similarly situated,

            CASE NO. 10-11355
  Plaintiff,        HON. LAWRENCE P. ZATKOFF

v.

MBS DIRECT, LLC and
MBS TEXTBOOK EXCHANGE, INC.,

  Defendants.
_____/

## OPINION AND ORDER

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on December 20, 2012

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

This matter is before the Court on Plaintiff's Motion for Class Certification and Appointment of Class Counsel [dkt 49]. The parties have fully briefed the motion. The Court finds that the facts and legal arguments are adequately presented in the parties' papers such that the decision process would not be significantly aided by oral argument. Therefore, pursuant to E.D. Mich. L.R. 7.1(f)(2), it is hereby ORDERED that the motion be resolved on the briefs submitted. For the reasons set forth below, Plaintiff's Motion for Class Certification and Appointment of Class Counsel is DENIED.

## II. BACKGROUND

Defendant MBS Direct, LLC ("MBS Direct"), as a wholly owned subsidiary of MBS Textbook Exchange, Inc. ("MBS Textbook") (collectively "Defendants"), operates the largest mail-

order textbook business in the United States. Defendants serve more than 4,000 academic institutions nationwide and processes more than 12 million new and used textbooks annually. Plaintiff, on behalf of himself and a purported class of similarly situated individuals, alleges that Defendants employ deceptive sales practices to mislead customers—primarily students and their parents—into paying artificially inflated prices for textbooks.

A. PLAINTIFF'S FACTUAL ALLEGATIONS

*1. Generally*

Defendants maintain a network of sales agents who solicit exclusive relationships with universities and parochial or non-public secondary schools across the country, in which the schools agree to direct their students to purchase textbooks from Defendants at artificially inflated prices in exchange for commissions from the sale of textbooks. Defendants typically accomplish this by entering into a contractual relationship with each of the schools, establishing Defendants as the "exclusive" provider. A typical contract states the following or similar language: "School agrees that [Defendants] will be exclusive course materials retailer . . . and will only give the list of required textbooks to [Defendants]". Defendants have entered into such contracts with over 600 schools, including, but not limited to, the following institutions located in Michigan: Central Michigan University, Eastern Michigan University, the University of Michigan, University Liggett School, Cranbrook Kingswood Schools, and Detroit Country Day. In many instances, the schools then close their on-campus book stores in support of the exclusive relationships.

The schools provide Defendants with a list of textbooks required for students' courses, and the schools then establish links on their websites that direct students to Defendants' website. Students then enter their class information and are given a list of books assigned for those classes, which students

may then purchase from Defendants. Plaintiff purchased textbooks from Defendants for his child, who attended University Liggett School, by following a link on the school's website as described above.

*2. Commission to Schools*

As consideration for entering into the "exclusive" contracts and funneling their students to Defendants, Defendants offer the schools a negotiated percentage of the student purchases as an undisclosed commission, which Plaintiff refers to as a "kickback." If a school declines to receive a commission, textbooks are sold at a lower price to that school's students.

Neither Defendants nor the schools inform customers that the commissions, which range from 4-11% of the textbook sale prices, are being paid or that identical textbooks may be sold elsewhere at lower prices. Instead, statements on Defendants' website give the false impression that customers are receiving lower prices by utilizing Defendants to order textbooks. For instance, on the website page with the heading "The Advantages of MBS Direct", it states "MBS Direct relieves the burden, hidden costs and hassles of textbook fulfillment." It also claims in this same section that "Best of all, there are no start-up or hidden fees for our services." On the screen with the heading "Why Buy From MBS Direct?", one of the reasons provided is "Saving Money on Your Textbooks". It notes that "[t]he cost of textbooks has risen dramatically. Now more than ever, students need opportunities to save money." Defendants' website also lists certain frequently asked questions and answers. In response to the question "Can I save money by purchasing course materials directly from MBS Direct?" the answer is "Yes . . . used books, digital books (eBooks), Customer Loyalty program, and Guaranteed Buyback were all developed to save you the most money."

Prior to 2009, Defendants did not reveal any information on their website about the commissions. In 2009, Defendants amended their "Privacy Policy," which is located in the bottom corner of Defendants' website in small print. The Privacy Policy provides the following:

3

> On occasion, MBS Direct enters into agreements with educational institutions. Under such agreements, MBS Direct may provide services and other consideration to the educational institution, including, but not limited to, (i) providing students of the educational institution the opportunity to purchase books and other course materials from MBS Direct, (ii) providing the educational institution a commission, or other financial remuneration, based upon sales made to the educational institutions' students.

Plaintiff claims that the limited disclaimer is insufficient and misleading, as it merely states that Defendants *may* provide consideration or payment to the educational institutions, rather than stating that such consideration or payment *will* be paid. Further, Plaintiff claims this disclosure is located at the end of the "Privacy Policy", which is not where a consumer would normally look for this type of information, and it is not necessary for a customer to click on this link in order to purchase a book.

### 3. Deceptive Practices for Used Book Sales and Purchases

In addition to selling new textbooks, Defendants also sell used textbooks. In fact, they claim to have the largest inventory of used books in the country. Defendants also pay schools that have exclusive contracts with Defendants an undisclosed commission on used books, which inflates the used book prices for students. Defendants also misrepresent that they can repurchase students' used books at "top dollar" when, in fact, the value Defendants pay for used books at schools that have exclusive contracts is less than the amount they pay for the same books at other institutions that do not have exclusive contracts.

### 4. Defendants' Affiliate Website

Defendants also operate an affiliate website, www.textbooks.com, which offers the same textbooks but at significantly lower prices. In addition, www.textbooks.com offers free shipping on orders over $25.00, while Defendants' other website charges for shipping on all orders, regardless of price. Defendants do not inform students attending schools that have exclusive contracts with Defendants that their textbooks can be purchased on its affiliate website for lower prices.

**B. CLAIMS**

Plaintiff claims that, pursuant to the actions described above, Defendants (1) violated the Michigan Consumer Protection Act ("MCPA), Mich. Comp. Laws § 445.901 *et seq.*, (2) committed fraudulent misrepresentations and omissions, and (3) were unjustly enriched.

Based on these claims and purported harm done to other potential Plaintiffs, Plaintiff filed the instant motion seeking to certify the following class:

> All persons who purchased textbooks and other course material through MBS on or after April 5, 2004, whose educational institution entered into a contract with MBS whereby MBS paid a remuneration to the schools in exchange for the schools directing their students to purchase textbooks and other materials from MBS.

### III. LEGAL STANDARD

"A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). When reviewing a motion for class certification, the Court must conduct a "rigorous analysis" of the requirements under Rule 23. *Sprague,* 133 F.3d at 397 (quoting *General Telephone Co. of the Southwest v. Falcon,* 457 U.S. 147, 161 (1982)). Frequently that "'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart*, 131 S. Ct. at 2551-52. The Court is not bound to accept the allegations on the face of the complaint as true, and should probe further into the facts when necessary to determine whether these requirements have been met. *Weathers v. Peters Realty Corp.,* 499 F.2d 1197, 1200 (6th Cir. 1974) ("[O]rdinarily, the determination should be predicated on more information than the pleadings will provide."). "The district court retains broad discretion in determining whether an action should be certified as a class action, and its decision,

based upon the particular facts of the case, should not be overturned absent a showing of abuse of discretion." *See Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988).

## IV. ANALYSIS

To proceed with a class action, Plaintiff must satisfy requirements set forth in Fed. R. Civ. P. 23(a) and (b). Rule 23(a) authorizes one or more members of a class to bring suit as a representative for the class if the following four requirements are met:

1) the class is so numerous that joinder of all members is impracticable ("Numerosity requirement");

2) there are questions of law or fact common to the class ("Commonality requirement");

3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ("Typicality requirement"); and

4) the representative parties will fairly and adequately protect the interests of the class ("Adequacy requirement").

*See* Fed. R. Civ. P. 23(a).

Additionally, at least one of the three distinct elements of Rule 23(b) must also be satisfied. In this case, Plaintiff seeks to proceed under Rule 23(b)(3), which requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" ("Predominance requirement"). Fed. R. Civ. P. 23(b)(3).

While making no determinations as to the satisfaction of the requirements in Rule 23(a), the Court's analysis begins with—and ultimately turns on—application of Rule 23(b)(3). Plaintiff "must establish that 'the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole . . . predominate over those issues that are subject only to individualized proof.'" *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 (6th Cir. 2007) (citations omitted). "[C]ommon issues

may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues." *Id.* (citation and internal quotation marks omitted).

As described below, Plaintiff has failed to satisfy Rule 23(b)(3) because: (1) each potential class member's claim would be governed by the law of the State in which the member made the challenged textbook purchase; and (2) any common issues of fact cannot overtake the individualized legal issues that predominate this case.

**A. APPLICABLE LAW**

Plaintiff's Counts are all based on state law. Thus, a preliminary question arises as to whether the Michigan law cited by Plaintiff, a Michigan resident, to support his claims occurring in Michigan, should be applied to the class members who live and purchased textbooks in their home States. In this regard, Plaintiff's Complaint and Motion appear to indicate that Plaintiff seeks to have the Court apply the consumer protection law of the state in which each potential class member resides and purchased textbooks. *See* Dkt. 1 at ¶ 56 ("As a result of MBS' violation of the Michigan Consumer Protection Act and *similar statutes in other states*, Plaintiff and members of the Class have incurred damages.") (emphasis added). Plaintiff, however, appears to make no indication as to whether Michigan fraud and unjust enrichment law should be applied to the class members. The Court therefore must first determine the law applicable to the potential class members, because "[i]f more than a few of the laws of the fifty states differ, the district judge would face an impossible task of instructing a jury on the relevant law." *American Medical Sys.*, 75 F.3d at 1085.

Michigan's choice-of-law rules determine which state's consumer-protection, fraud, and unjust enrichment laws are applicable to Plaintiff's claims. *See Muncie Power Prod., Inc. v. United Techs. Automotive, Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) ("Federal courts sitting in diversity must apply the choice-of-law rules of the forum state.") (citations omitted). As Michigan's choice-of-law rules vary

slightly based on the type of action in question, the Court shall address the law applicable to each of Plaintiff's Counts in turn.

   *1. Counts I and II*

With respect to tort actions, Michigan law applies unless there is a rational reason—such as another state's interest—to apply other law. *See Daimler-Chrysler Svs. North America, LLC v. Summit National, Inc.*, 289 Fed. App'x. 916, 921 (6th Cir. 2008) (citation omitted). The MCPA is to be construed with reference to the common law tort of fraud. *See Mayhall v. A.H. Pond Co., Inc.*, 129 Mich. App. 178 (1983).

In determining whether a rational reason to supplant Michigan law exists, the Court applies a two-step analysis. *Williams,* 138 Fed. App'x. at 803. First, the court "must determine if any foreign state has an interest in having its law applied. If no state has such an interest, the presumption that Michigan law will apply cannot be overcome." *Id.* Second, if a foreign state does have an interest in having its law applied, the court must then "determine if Michigan's interests mandate that Michigan law be applied, despite the foreign interests." *Id.* The Court does so by balancing the competing states' interests. *Isley v. Capuchin Province*, 878 F. Supp. 1021, 1023 (E.D. Mich. 1995). The Court makes its determinations in accordance with Section 145 of the Restatement (Second) of Conflicts of Law, which lists the following factors to consider: 1) the place where the injury occurred; 2) the place where the conduct causing the injury occurred, 3) the domicile, residence, place of incorporation and place of business of the parties; and 4) the place where the relationship is centered. *Johnson v. Ventra Group, Inc.*, 191 F.3d 732, 741 (6th Cir.1999).

Here, the potential class members reside in all fifty states and the District of Columbia (hereinafter the "States") and purchased textbooks in each of these locations, thereby causing the alleged harm to occur there. As a result, the States have an interest in having their law applied to their residents' claims. Aside from this, Missouri—as Defendants' principal place of business—has an

8

additional interest in having its law applied to a claim against a corporation operating within its borders. Given these competing interests, the Court proceeds to the second step of its inquiry to determine if Michigan's interests require the application of Michigan law.

After weighing the respective interests, the Court concludes that the consumer-protection/fraud laws of the potential class members' home States would govern their claims. First, the *Johnson* factors all weigh in favor of applying the laws of the potential class members' home States: 1) the harm occurred in each potential class member's home state; 2) the place where the conduct causing the harm occurred is the class members' home States; 3) the potential class members reside in their respective home State; and 4) the relationship is centered in each potential class member's home State. The Court acknowledges that Missouri may have some interest in preventing deceptive or fraudulent practices by companies operating within its borders. Yet the State with the strongest interest in regulating deception and fraud is the State where the *consumers*—those receiving the "protection" of consumer-protection laws—are harmed by deception and fraud.

Second, with respect to Michigan, the Court finds it has little or no interest in having its laws applied to class action claims asserted against a non-resident company, primarily by non-residents who did not purchase their textbooks in Michigan. Indeed, by enacting § 445.911(3) of the MCPA, the Michigan Legislature attempted to prohibit such claims. *See* Mich. Comp. Laws § 445.911(3) ("A person who suffers loss as a result of a violation of [MCPA] may bring a class action on behalf of persons *residing or injured in this state*[.]") (emphasis added). Thus, Michigan's interests do not mandate that Michigan law be applied to the potential class members' claims; rather, each potential member's home State has a stronger interest in having its laws apply to its residents. The Court turns next to the applicable unjust enrichment law.

  *2. Unjust Enrichment (Count III)*

9

In determining the choice of law rules applicable to unjust enrichment claims, courts apply Michigan's choice of law rules governing contract actions. *See Johnson*, 191 F.3d at 741 (citing *Aetna Casualty & Sur. Co. v. Dow Chem. Co.*, 883 F. Supp. 1101, 1104N10 (E.D. Mich. 1995)).

The common law choice of law rule followed by the Michigan courts is the traditional "law of the place of contracting," according to which the court is to apply the law of the place where the contract was made. *See Wells v. 10-X Mfg. Co.*, 609 F.2d 248, 253 (6th Cir. 1979). The Michigan Supreme Court, however, has stated that although it has not abandoned the traditional "law of the place of contracting" rule, it will apply the policy-centered analysis approach set forth in § 188 of the Restatement (Second) of Conflict of Laws in appropriate cases. *See Chrysler Corp. v. Skyline Indus. Serv., Inc.*, 448 Mich. 113 n. 28 (1995). In such cases, courts should apply the law of the state that has the most "significant relationship to the transaction and parties" based on: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(2) (1971).

Because an analysis using the factors in § 188(2) of the Restatement is nearly identical to the analysis using the *Johnson* factors the Court used above in connection with the consumer protection claims, the Court finds—for the same reasons—that each potential class members' home State has the most significant relationship to the relevant transactions and parties.   As such, the laws of each home State must govern potential class members' unjust enrichment claims.

Having found that the laws of each potential class member's home State shall govern all of Plaintiff's claims in this case, the Court turns next to the question of whether and to what extent the States' laws differ from one another, because "[i]f more than a few of the laws of the fifty states differ,

10

the district judge would face an impossible task of instructing a jury on the relevant law." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1085 (6th Cir. 1996).

    *3. Differences in Consumer Protection and Unjust Enrichment Laws*

Turning first to the States' consumer protection/fraud laws, the Court finds them to be in considerable variance. *See In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1018 (7th Cir. 2002) (finding that state consumer fraud laws "vary considerably" and noting that "courts must respect these differences rather than apply one state's law to sales in other states with different rules.") For instance, state consumer fraud laws vary in regard to several key issues—the type of prohibited conduct, proof of injury-in-fact, available remedies, scienter, statutes of limitations, and reliance. *See, e.g., BMW of North Am., Inc. v. Gore*, 517 U.S. 559, 570 (1996) ("The result is a patchwork of rules representing the diverse policy judgments of lawmakers in 50 states."); *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1120 (8th Cir. 2005) (reversing class certification because state consumer fraud laws vary widely). Moreover, several States' consumer fraud laws require proof of deception or reliance by each individual class member, thereby precluding class certification. *See Castano v. Am. Tobacco Co.*, 84 F.3d 734, 739 (5th Cir. 1996) ("[A] fraud class action cannot be certified when individual reliance will be an issue.").

As to unjust enrichment, the Court similarly finds that the States' laws differ. Although unjust enrichment claims are based on common law principles identified in the Restatement, *In re Terazosin Hydrochloride,* 220 F.R.D. 672, 697 n. 40 (S.D. Fla. 2004), they nevertheless vary to some extent. *See Lilly v. Ford Motor Co.,* No 00 C 7372, 2002 WL 507126, at *2 (N.D. Ill. Apr. 3, 2002). In fact, interpretations vary even within the same state, let alone among the fifty states. *See In re Sears, Roebuck & Co.*, Nos. 05 C 4742, 05 C 2623, 2006 WL 3754823 at *1 n. 3 (N.D. Ill. Dec. 18, 2006). Additionally, even the actual definition of unjust enrichment varies from state to state:

> Some states do not specify the misconduct necessary to proceed, while others require that the misconduct include dishonesty or fraud. Other states only allow a claim of unjust enrichment when no adequate legal remedy exists. Many states, but not all, permit an equitable defense of unclean hands. Those states that permit a defense of unclean hands vary significantly in the requirements necessary to establish the defense.

*Clay v. Am. Tobacco Co.*, 188 F.R.D. 483, 501 (S.D. Ill. 1999) (internal citation omitted).

Thus, because the potential class members' claims would require adjudication using the varying laws of so many jurisdictions, a single nationwide class is not manageable. *See Bridgestone/Firestone*, 288 F.3d at 1018.

### 4. Conclusion

Having determined that the laws of the potential class members' home States shall govern and that these laws vary greatly, the Court finds that no common question of law predominates in this case. *See Bridgestone/Firestone*, 288 F. 3d at 1017–18 (finding that common issues of law cannot predominate if adjudication of the class claims would require the application of numerous states' varying substantive consumer fraud and unjust enrichment laws). The Court turns next to an analysis of whether, as an alternative, common issues of fact predominate.

### B. COMMON ISSUES OF FACT

In addition to the distinct number of laws that must apply, several distinct factual matters also weigh against the Court's certification of the proposed class. A vital part of Plaintiff's claim is that the class members were misled by Defendants' representations into purchasing textbooks at inflated prices, when the same textbooks could be purchased cheaper elsewhere. Yet, even assuming Defendants' arrangement with schools was the same across the country, the purported harm suffered by the potential class members depends on highly individualized factual circumstances. For instance, where and when consumers purchased textbooks; what textbooks they purchased; how much they paid; whether they made the purchases because of misrepresentations; whether they could have purchased textbooks

cheaper; and whether any resulting price difference was grounds for a legal remedy are all highly specific determinations that vary from class member to class member. These issues are inapplicable to the class as a whole because, varying from member to member, the issues are not subject to generalized proof. *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 (6th Cir. 2007) ("[t]o satisfy the predominance requirement in Rule 23(b)(3), 'a plaintiff must establish that 'the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof.'").

Moreover, these factual differences translate into significant legal differences stemming from disparate application of States' rules in regard to, among other issues, injury-in-fact, scienter, and reliance. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 624 (agreeing with the Third Circuit and finding that "[d]ifferences in state law . . . compound these [factual] disparities.").

Also relevant is the fact that Plaintiff seeks compensatory damages for the class as a result of Defendants' alleged unfair or deceptive practices, as opposed to seeking class-wide injunctive or declaratory relief. Therefore, the potential recovery of the individual class members is yet another individualized determination that will vary from member to member. *Wal-mart*, 131 S. Ct. at 2558 (finding that predominance is self-evident in a collective action for an injunction, but that individualized claims for money require the judge under Rule 23(b)(3) to make further inquiry into predominance before allowing the class"). As such, the Court finds that individualized factual issues predominate this case.

## V. CONCLUSION

For the reasons above, the Court finds that individualized questions of fact and law predominate this case, precluding the Court's certification of the proposed class under Fed. R. Civ. P 23(b)(3).

Accordingly, it is HEREBY ORDERED that Plaintiff's Motion for Class Certification and Appointment of Class Counsel [dkt 49] is DENIED.

IT IS SO ORDERED.

Date:  December 20, 2012

s/Lawrence P. Zatkoff
HON. LAWRENCE P. ZATKOFF
U.S. DISTRICT COURT JUDGE